MALVERN GRAVEL COMPANY *v.* MCMILLAN.

4-5903 139 S. W. 2d 390

Opinion delivered April 15, 1940.

*H. B. Means* and *Joe W. McCoy*, for appellant.

*Glover & Glover*, for appellee.

HOLT, J. Appellees sued appellant for damages in the amount of $3,000, alleged to have been caused by appellant in negligently causing the Ouachita river to overflow farm lands owned by them. On a jury trial they were given judgment for $500.

The suit was based upon the following allegations of negligence:

"Plaintiffs allege that the defendant through its agents, servants and employees, negligently cut the east bank of the Ouachita river for a distance of about three hundred yards just a few feet west of their land. Plaintiffs allege that the defendant has partly constructed a levee at each end where it cut the banks of the river, and has cut and is now cutting a canal or opening several feet deep and within a few feet of plaintiffs' land out from said river, and which causes the channel of the river to be changed when the water rises to a height of about thirteen feet, and that on account of its negligence in this respect at least half of the plaintiffs' lands as above described is now totally ruined for farming purposes by said change in the river causing sand and gravel to cover the soil so deep that it cannot be farmed again, and on account of the swift current being negligently diverted and carried over plaintiffs' land, many deep holes were washed in said land, some of them being several feet deep.

"Plaintiffs allege that on account of the negligence of the defendant as above stated in cutting the bank of the river and in cutting a canal or opening several feet

deep which is now only a few feet from plaintiffs' land, a small rise of twelve or thirteen feet would put the water over his low lands, and destroy crops, if planted, and cause further sand and gravel to be washed over their lands.''

''Appellant answered denying every material allegation in the complaint.

Appellant urges on this appeal that no act of negligence upon which to base an action for damages against it has been shown by appellees, and therefore, the trial court erred in refusing to instruct a verdict in its favor at the close of the testimony. After a careful review of this record, it is our view that this contention must be sustained.

Stated in its most favorable light to appellees, the evidence is to the following effect:

The land affected amounts to approximately twenty acres and is known as the McMillan land. During the flood of 1927, the river bank that protected this land would overflow on a nineteen foot rise. That flood, however, lowered the height of the bank until at the present time the river overflows on a thirteen foot rise. In addition to lowering the bank, the 1927 flood cut the top soil from a strip of land along close to the low part of the McMillan land. This stripped piece of land is referred to as the Keith sand field.

In 1929 appellant, Malvern Gravel Company, established its plant where it is now located. It dug a succession of five borrow pits from a point approximately 250 feet from the river bank to within 40 or 45 steps of appellees' land. These borrow pits are formed by the operation of steam shovels and drag lines in excavating the sand and gravel. These pits run into each other and are referred to by appellees as a canal. In the process of extracting the sand and gravel, appellant dumped the top soil in places along the edges of these pits. Appellant built a railroad track along the river bank between the river and the nearest borrow pit some 250 feet away. There is no evidence in this record that

appellant in its operations has cut or lowered the river bank below that left by the action of the 1927 flood.

Webb Hardwick, one of the appellees, testified that the appellant started on the bank of the river near the NW corner of the Keith land and cut a canal straight to the NW corner of the McMillan land, approximately 100 yards wide which extended from the river to within 35 or 40 steps of their land; that the first damage done to the land was in 1935, caused by the gravel and sand being washed through the canal cut by the appellant; that prior to the time the canal was cut, the river made an "S" curve just west of the land and that the old river came in through the McMillan land, and that when the water got up high enough to overflow the McMillan low ground, it would back up from the slough or old river bed or down the town creek, and was back water; that when it came across the McMillan land it was not swift water and would build the land up by leaving settlings on it. It never washed these holes and sand and gravel on the other end where it is now; that it did, one time, prior to the time the canal was cut, wash sand and gravel on it, in the year 1927, at which time it only covered a part of it, the northwest corner; that in cutting the bar pits the appellant threw the top soil to one side making embankments on the west side of the bar pit, which embankment ran almost back to the river, but not quite; that in times of high water now, the sand and gravel is washed on the land; that the digging of the canal or bar pits was the cause of the damage to the appellees' land.

He had known the land for 25 years. The first time he ever farmed it was in 1935. In 1927, the flood put trees and clay roots on this land up to and across the old river bed and left the sand and gravel in the northwest corner only.

That the 1937 flood washed out a hole near the old river bed on appellees' land, approximately three or four feet deep; that the old corn rows were in the bottom of the hole in perfect condition at the present time; that the 1939 flood refilled the hole. When the river gets 26 or 27 feet of water in it like the 1927, 1935, 1937, 1938 and 1939 floods it gets all over the bottoms and all over

appellees' land; that the 1927 flood washed away a part of the old high bank at Keith Ford and some of the trees.

When asked what caused the damage to his farm, his answer was "I can only say that it has been done since the canal has been built there."

Appellees' witness, Silas Smith, testified: "Q. Has that land been damaged lately? A. Yes, sir. Q. Prior to 1935, what kind of land was it? A. It was the best block of land up and down this river. Q. What condition is this land in now? A. I would consider it in very poor condition. Q. What is the trouble with it? A. Sand has washed in on it and there are holes in it. Q. Tell the jury what caused it? What caused it to wash° in there? A. High water. Q. What caused the water —prior to that there wasn't any on it? A. No. Q. From 1935 on it has been changed? A. Yes. Q. What caused that change? A. There has been some canals cut by the Malvern Gravel Company. Q. What did that do? A. Turned the force of the water on it. . . . Q. From 1927 until 1935, isn't it a fact that the Ouachita river never gets over eighteen or nineteen feet and never damaged the McMillan land. A. That's right. Q. Has the Malvern Gravel Company disturbed that river bank? A. It has."

Silas Smith on cross-examination further testified that he was over the land after the 1927 flood. Only a little bit of sand on it in the northwest corner. Approximately one and a half acres. Would not say there was as much as four or five acres. Some trees washed over it and some clay roots. The 1927 flood washed away the high bank down to the Keith Ford and 150 yards south and west of the Keith Ford. Washed away some of the timber. The river came through there and practically stripped the Keith Sandy Field. Keith Sandy Field comes down and joins the north line of the McMillan low ground. The canal or bar pits were dug right after the 1927 flood stripped the soil off of the Sandy Field. The Malvern Gravel Company established its plant where it is now located in 1929. It was the flood of 1927, prior to the establishment of the Malvern Gravel

Company, which washed away the high bank south of the Ford and stripped the Keith Sandy Field. "Q. Would you tell the jury that those bar pits went to the river then? A. No."

Silas Smith further testified that there was a railroad track that run from the plant and came down on the bar where they had not dug. Its line of railroad running along the bank has never been moved. They cross over the railroad and leave that dump and come over on the south side where they are still digging.

"Q. And the river bank is just as high now as it ever was where the railroad runs down there? A. No, sir. Q. Where the railroad runs, you mean it has been dug out? A. Washed away. . . . Q. You know the bar pits do not extend down to the river? A. No, they don't. . . . Q. You know that since that time the line of railroad has never been taken up? A. Only by the water. . . . Q. They never started out to the river and cut a complete ditch? A. Not that I know of. Q. The only one that they started was south of the railroad and run down into the Sandy Field? A. That is right. Q. The water has to get pretty high to get up over that track before it comes into the bar pits? A. That is right. Q. And get out of the bar pits and on to the Sandy Field? A. That is right. Q. Before any bar pits were ever dug there, the river broke over the high bank and stripped the sandy field and went down on the McMillan land? A. Yes, sir. Q. The river went through there before any canal was ever dug? A. Yes, sir."

Appellees' witness, Bud Smith, testified: "Q. In 1935 and from then on what caused the damage to this property? A. Well, I couldn't say that there was any other cause than that canal that is cut on the land from the river right into it."

He further testified that the 1927 flood washed the high bank away for a distance of 75 yards. Washed away most of the timber on it; that it washed some few acres in the Keith Sandy Field. Sandy Field lies between McMillan low ground and the river. Part of

the trees that were washed away stopped on the Mc-Millan land and part of them came on his. Probably three-quarters of a mile. The current was strong enough to wash down the bank and carry trees for a mile. It washed sand and gravel on the McMillan land, probably for an acre and a half—not as much as five acres.

There is other evidence on the part of appellees of a corroborative nature.

Appellant's witness, Frank McGillicuddy, manager for appellant, testified that appellant in its operations did not cut the river bank anywhere; that they never moved the railroad track or lowered the bank on which the track ran; that it was from 250 to 400 feet from the end of the digging, or the borrow pits, or the canal, to the river; that they have never molested the bank or dug through to the river.

There are five of these borrow pits from twelve to fifteen feet deep and, according to appellees, they form a canal—closed, however, at both ends. Appellees on page 44 of their brief say: "This long canal as shown by the picture and described in the evidence was near the bank of the river and was wide, long and deep and when the water gets to thirteen feet as alleged, it began to come over this bank into the pit and, of course, would wash the space between the canal and the river."

There is other evidence that we deem unnecessary to set out here.

It is our view that no substantial evidence is presented in this record that appellant cut or lowered the river bank below that left by the 1927 flood. Just how the digging of the five borrow pits near appellees' tract of land, with the river bank undisturbed, could cause damage to appellees' land when the frequent overflows cover them is difficult to understand unless we are to indulge in speculation and conjecture. We have many times held that jury verdicts cannot be based on testimony of witnesses that has for its foundation speculation and guess. There must be substantial testimony to support it. *The Coca-Cola Bottling Company* v. *Wood,* 197 Ark. 489, 123 S. W. 2d 514.

Before appellees could recover it devolved upon them to show negligence on the part of appellant in the use of its property which caused the damage to appellees' land, and this, we think, they have failed to do. The evidence does not show that appellant diverted the flow of the water in the river so as to cause it to flow upon appellees' land. The land was overflowed with every thirteen foot rise in the river, but not because of any negligent act of appellant.

The general rule of law is clearly stated in *Taylor v. Steadman*, 143 Ark. 486, 220 S. W. 821, where this court said: "It is too well settled for controversy that the owner of lands abutting a stream is entitled to have the flow of waters in the stream to flow its natural and accustomed course without obstruction, and that any act which causes a diversion of such natural flow of water and inflicts injury creates a right of action. In other words, a land owner who sustains injury by reason of the diversion of a natural water course is entitled to recover damages against the one who caused it."

But as we have said, there is no substantial evidence presented that any act of appellant diverted the flow of the river at high or low stage, so as to cause damage to appellees' land.

There is no showing that any of the borrow pits or canals were cut through high land that in its natural state served as an impediment preventing river overflows from entering the pits and thus spreading to appellees' property, where such water would not have gone but for the excavations.

There is an abundance of evidence in the record that the land in question has been damaged by these overflows. However, we are clearly of the view that appellant cannot be held responsible therefor.

For the error indicated, the judgment is reversed, and, since the cause seems to have been fully developed, it will be dismissed.

HUMPHREYS, MEHAFFY and BAKER, JJ., dissent.